ZENITH ELECTRONICS
CORPORATION,
Plaintiff,

v.

The UNITED STATES,
et al., Defendants.

Nos. 87–01–00039, 87–01–00122.

United States Court of
International Trade.

Jan. 28, 1993.

Willkie Farr & Gallagher, William J. Clinton, James P. Durling, Lee M. Zeichner, and David E. Bond, Washington, DC, for defendant-intervenors AOC Intern., et al.

Frederick L. Ikenson, P.C. (Frederick L. Ikenson and J. Eric Nissley, Washington, DC, of Counsel), for plaintiff Zenith Electronics Corp.

Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civil Div., United States Dept. of Justice, Michael S. Kane, Washington, DC, attorney (Jeffery B. Denning, Attorney Advisor, Office of the Chief Counsel for Import Admin., Dept. of Commerce, of counsel), for defendant.

## MEMORANDUM OPINION AND ORDER

WATSON, Senior Judge:

This is the latest court decision in a series of actions involving color television receivers ("CTV's") from Taiwan. In it the court reviews a remand determination by Commerce filed on January 31, 1992. That remand determination contained the results of remands ordered by the court in *A.O.C. International v. United States*, 13 CIT 716, 721 F.Supp. 314 (1989) and *Zenith Electronic Corp. v. United States*, 15 CIT ——, 770 F.Supp. 648 (1991). Both of the remand orders were the result of judicial review of the final results of the first administrative review of the antidumping duty order on CTV's from Taiwan for the period from October, 1983 through March, 1985. *Color Television Receivers, Except for Video Monitors, from Taiwan; Final Results of Antidumping Duty Administrative Review, 51 Fed.Reg. 46895 (December 29, 1986).*

The court issued an order remanding the case to Commerce, *inter alia*, to determine what portion of a forgiven Taiwan commodity tax was passed through to home market purchasers and included in the home market price. *Zenith Electronics Corp. v. United States*, 770 F.Supp. 648, 651 (C.I.T.1991). This was done so that a lawful determination could be made as to what extent the price in the home market of Taiwan might have been higher due to the "excusable" fact that it contained a tax which was not levied on the exported merchandise. See *Daewoo Electronics Co., Ltd. v. United States*, 15 CIT ——, 760 F.Supp. 200 (1991). See also, *American Alloys, Inc. et al. v. United States*, 17 CIT ——, 810 F.Supp. 1294 (1993).

Commerce sent questionnaires concerning tax pass-through to the four respondents in this review who had home market sales of CTV's, namely AOC, Proton, Sampo, and Tatung. For the sake of convenience they are referred to herein as the Taiwwan interests. The two respondents who did not have home market sales were Shin–Shirasuna Electric Corp. ("Shirasuna," now known as Technol–Ace Corp.) and RCA Taiwan Ltd. ("RCA"). The responses to the questionnaire gave information concerning the Taiwan domestic market for the period 1981 through 1990. *See generally*, Respondents' Questionnaire Response, (Public Document No. 42); (The references to the record use the numbering system employed by Commerce in the index filed with the court on March 12, 1992). Respondents also submitted a report prepared by their economic consultant, National Economic Research Associates (NERA), which suggested a methodology for quantifying the portion of the Taiwan Commodity Tax passed through to consumers. (Pub. Doc. 43; Pro Doc. 17, Exhibit 1; "NERA Report.") Zenith submitted the comments of its own economic consultant, Professor

Michael D. Bradley, (Pub.Doc. 61, Pro Doc. 19).

 Commerce made two basic factual determinations. It concluded that the Taiwan companies all had constant costs, meaning that they could produce additional output for the same cost per unit as prior output. That determination is not in dispute. Commerce also concluded that the Taiwan color television industry was highly competitive, to such a degree that no individual company was capable of departing from the market price or capable of earning excess profits. Commerce then applied accepted economic reasoning to reach the ultimate conclusion that, in a market such as that found to exist in Taiwan, a tax would be fully passed through to the consumer and would not be absorbed to any extent by a producer. Commerce's conclusion about the nature of the economic forces governing the behavior of the entire industry obviated the need for specific econometric measurement of pass-through.

The degree of competitiveness of the Taiwan color television industry and its pricing behavior is the subject of intense dispute between the parties to this action. Commerce stresses that its conclusion was based on (1) the large number of producers in the market, (2) the low market share of each producer, (3) the frequency with which producers entered the market, (4) the degree of concentration in the industry as measured by the Herfindal–Hirschman Index ("HHI"), and (5) the low return on assets and equity of the television industry compared to the average returns for the Taiwan electronics industry.

In its final results on the remand, Commerce concluded that the tax pass-through rate was 100%. Thereafter, the Taiwan interests filed a motion for entry of final judgment affirming the results of the remand. The government filed a response indicating that it had no objection to the entry of final judgment. Zenith then filed its opposition to the motion for final judgment, together with a cross-motion for a second remand.

On the question of tax pass-through the court was looking for substantial evidence that economic conditions in the industry were such that individual firms would have no discretion whatsoever in their pricing decisions. If that were the case, they would be compelled by ineluctable economic forces to fully pass on any taxes to the consumer. The court has not found substantial evidence in the record to support that conclusion. What the court has found is evidence regarding the structure and behavior of the industry which is insufficient to allow a reasonable person to conclude that the firms in the industry had no pricing discretion.

There is evidence that approximately 22 firms were involved in the Taiwan color television industry from 1981 to 1990 and the largest market share achieved by any one of them was less than 17%. There is also evidence that seven different firms had at least 10% of the Taiwan domestic market in at least one of those years and the firm with the largest market share was not the same throughout the period. *See* Technical Appendix I at 7–8, Technical Appendix II at 6–7; NERA Study at 24–26, 30–31.

The court is of the opinion that this evidence is far too abstract to support a conclusion that the firms in the industry had no power over their pricing decisions. At best, this evidence can suggest that the industry might be more competitive than one which is highly concentrated, but it is far from substantial evidence that competition was so powerful a force or so perfect in the economic sense that an individual firm in the industry had no price setting power. This sort of industry structure could just as easily be associated with a level of competition which allows firms to engage in price setting to a meaningful degree.

The same thing is true of the ITA reliance on the degree of concentration in the industry as measured by the Herfindal–Hirschman Index ("HHI"). This index is a tool used by the Department of Justice to measure the level of concentration in an industry when it is applying its merger guidelines. For the period involved in this case, the HHI figures for the Taiwan tele-

vision industry were approximately one thousand, a number which Commerce considered to be additional evidence that the industry was not concentrated and was competitive. The court finds the use of this index to be of no evidentiary value whatsoever. A value of one thousand is at the border of regions that the Department of Justice characterized as unconcentrated (below one thousand) and moderately concentrated (one thousand to one thousand eight hundred). Pub.Doc. No. 50, Exhibit I at S. 5. In fact, the court finds it noteworthy that the index measurement for the Taiwan television industry is not even close to the index measurement for industries which are more reasonably characterized as having highly competitive markets with relatively undifferentiated products, such as residential lighting fixtures with an index of 236, pumps and plumbing equipment with an index of 192, or speed changers, drives and gears with an index of 280. U.S. Department of Commerce, 1987 Census of Manufacturers: Concentration Ratios in Manufacturing (Feb. 1992, Table 4). In short, the HHI statistic is, in the court's view, totally lacking in evidentiary weight.

The government argues that Commerce did not use the HHI in the abstract but assessed it in the context of an additional factor; the ease of entry and exit to and from the Taiwan television industry. However, the court sees no special synergistic effect arising from the combination of the statistics on ease of entry into the market and the HHI. Of course it is true that low entry barriers in an industry may produce high levels of competition, but the conclusion that this must be the case in the Taiwan television industry is nothing less than supposition.

Commerce has also relied on calculations of profit rates for the four Taiwanese producers, finding these to be negative or zero for AOC and Proton and three to four percent for Sampo and Tatung. However, close examination of these figures by the court shows that they are not really a calculation of profits on color television sets. The figures were derived from the returns on assets or returns on equity for entire companies. It is clear that a company's return on assets or return on equity can differ dramatically from its profit ratio on its sales of televisions. In the opinion of the court, such evidence is insufficient to support a finding of low profits or nonexistant profits on sales of television sets and certainly inadequate to support the inference that such circumstances were an indication of competition so intense that industry members were forced to adhere to market prices in all cases.

Individually or in combination, the court does not view the aforementioned facts as evidence which a reasonable mind would consider adequate to support the conclusion that firms in the Taiwan television industry could not depart from certain ordained market prices for their products. For experts to draw such a conclusion, more substantial evidence would be essential.

This is a situation in which the existence of substantial evidence for a conclusion is particularly important because the conclusion is one which completely eliminates the need to find specific facts regarding individual producers. Moreover, the conclusion for which evidentiary support is sought is one which completely predetermines the conduct of all the members of an industry. In these circumstances the court does not find these general factors concerning the industry to be such relevant evidence as a reasonable mind can accept as adequate to support a conclusion that the members of the industry were completely deprived of the power to vary their prices from the market price. This evidence falls short of the fundamental standard of review applied by the court in such cases. *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938); *Matsushita Elect. Indus., Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir.1984). Stated differently, the court does not find that this evidence permits the drawing of two inconsistent conclusions. If the evidence relied on by Commerce was ambiguous then there might be reason to defer to Commerce's view of the facts. *Labor Board v. Nevada Consolidated Copper Corp.*, 316 U.S. 105, 106, 62 S.Ct. 960, 961, 86 L.Ed. 1305. However, in the

view of the court the affirmative evidence relied on by Commerce is wholly insubstantial.

The insubstantiality of the evidence which is cited in support of the conclusion reached by Commerce becomes even more pronounced when we turn to that evidence in the record which is more specifically related to the sale of color television receivers. Far from providing substantial evidence for the determination reached by Commerce, that additional and more persuasive evidence tends to provide support for a contrary conclusion.

In connection with the subject of ease of entry into the Taiwan television industry and its profitability, there is important evidence which contradicts the conclusion reached by Commerce that the Taiwan producers had no control over the prices. It is noteworthy that the closer the evidentiary materials come to the actual facts regarding production and sales of televisions in Taiwan, the more we find Commerce attempting to explain away the most likely inferences arising from that evidence. In 1986, midway through the period under scrutiny Taiwan removed its barriers to imports of color television receivers. In the two to three years following the removal of that barrier, sales of color television receivers in Taiwan doubled.

To begin with, in normal economic analysis, the existence of a barrier to the importation of foreign merchandise is considered to be a factor which prevents perfect competition from developing. *See* P.A. Samuelson and W.D. Nordhaus, *Economics* (13th ed. 1989) at page 573. Moreover, the dramatic doubling of television sales within a few years after the removal of import barriers would normally be considered a clear indication that the preexisting market had been undersupplied, a circumstance which is distinctly characteristic of imperfect competition in which producers have the power to set their prices.

Commerce's in-house economist tried to explain these dramatic sales increases as being attributable to increases in worker income and appreciation of the exchange rate. But the court finds it unreasonable to think that an increase of approximately 3% a year in the average rate of growth of workers' wages and unspecified exchange rate effects can account for the magnitude of the sales increase which occurred here. In the opinion of the court, the only reasonable way to interpret the doubling of sales in so short a period is as a strong counterindication to the existence of perfect or near perfect competition in the television industry or, stated differently, a good indication of the sort of competition in which firms have a meaningful degree of power to set their prices. In the opinion of the court, the attempted explanation of the sales increase as due to increased income on the part of the workers and a beneficial exchange rate is entirely unreasonable and goes far beyond the discretion which an agency has to interpret conflicting evidence.

There is another segment of specific evidence in the record which was not treated in a reasonable way. Zenith's economic expert, Professor Bradley, made a presentation to Commerce which showed that in sales of the 19 to 20 inch television size within the "large-fancy" category, prices of the four manufacturers involved here differed greatly, by as much as 60 percent, and those prices often moved in opposite directions. This is a category of televisions which covers the largest quantity of the sales made by the firms involved. The direct and reasonable inference to be drawn from evidence such as this is that the market under observation is not demonstrating anything approaching perfect competition and the firms are demonstrating the distinct ability to set their own prices.

Commerce apparently thought that it was incongruous to compare these categories of television sets, but the incongruity is not apparent to the court. Such information appears to be far more focused and specific than the other evidence relied on by Commerce. Moreover, aside from a convoluted and insufficiently supported assertion that the product mixes involved in Professor Bradley's comparison were not properly comparable, the other explana-

tions advanced by the government are rife with contradiction.

The government seems to take the position that even if these CTV products were deliberately differentiated by the producers, that would not preclude a finding that competitive forces prevented them from setting their own prices. However, this does not make economic common sense, as is pointed out by Zenith, because there is no reason for a manufacturer to spend resources on styling and advertising in order to differentiate its product if there is no potential benefit in the price that it can charge. In the sort of market envisaged by Commerce's determination, firms which have no power in setting the market price and can theoretically sell all they want at that compulsory market price, have no reason to waste resources on product differentiation. *See* R.C. Amacher and H.H. Ulbrich, *Principles of Economics,* 531 (1986). The large amount of brand name advertising shown in the record is inexplicable in the sort of market envisaged by Commerce.

This is similar to another contradictory argument made by the government. As was noted earlier, Commerce attempted to explain the dramatic increase in sales after the import ban was ended in 1986 as a result of increased purchasing power by consumers and a beneficial exchange rate. The government argues that Zenith's claim (that the increased sales demonstrated a preexisting lack of competition) was based on an assumption that the marginal cost of the imported product was the same as the marginal cost of the Taiwan product. The government argues, however, that there is every reason to believe that the marginal costs of the imported products were lower and supports this proposition by pointing out that Commerce has found that Taiwan producers sold televisions in their home market below the cost of production just to maintain market share. The government cites *Color Television Receivers From Taiwan; Preliminary Results and Termination in Part of Antidumping Duty Administrative Review,* 56 Fed.Reg. 36, 765, 36, 766 (August 1, 1991); *Color Television Receivers From Taiwan; Preliminary Results and Termination in Part of Antidumping Duty Administrative Review,* 55 Fed.Reg. 53, 023, 53, 024 (December 26, 1990). It appears to the court, however, that the ability of the Taiwan producers to sell in their home market below the cost of production in order to maintain market share is a very good indication of their ability to set prices which differ from market prices and to endure the consequences of those price settings for a meaningful period of time. If Taiwan was a market in which firms were compelled to accept the market price and could sell as much as they wanted at that price, they obviously would be sacrificing profits needlessly by selling below the market price and their behavior would make no sense. The court can see no meaningful distinction between the ability to sustain losses in order to maintain market share and the ability to absorb all or part of a tax by accepting lower prices than the market price. This is another example of the contradictions which seem to be inherent in the government's attempt to find support for its position in this action. It is also a strong indication that the Taiwan firms have the power to vary their prices.

In short, it is the opinion of the court that it is unreasonable to view the evidence in this record as demonstrating the existence of an industry whose members cannot set a price which differs from the market price. Such general facts as there are in the record are insufficient and could just as easily describe an industry with imperfect competition in which firms can set prices. The more specific evidence in the record points to an industry in which price-setting is the case and Commerce's rejection of that more specific evidence is strained and unreasonable.

This holding by the court does not in any way mean that Commerce is barred from relying on established economic principles to make a general determination about an industry in a proper case. With the proper evidentiary basis it is possible that Commerce can eliminate the necessity for making specific measurements of certain facts with respect to individual firms. But a conclusion that an industry operates

under economic conditions which are so constrained that an individual firm has no power to set its prices is a finding dependent on the existence of relatively extreme conditions. The evidence which demonstrates those conditions must be distinguishable from evidence which more likely indicates an industry with imperfect competition in which firms have some power to set prices. If it is not, then the final determination is nothing more than an arbitrary choice or, as here, a choice which contradicts the evidence.

For these reasons the court concludes that substantial evidence is lacking for Commerce's determination in the latest remand that the competitive condition of the Taiwan CTV industry dictated a complete pass-through of tax. The question of pass-through must be remanded again to Commerce to be measured in a manner consistent with the constant costs, imperfect competition, and price-setting ability found in the Taiwan market and this must be done on the basis of the record as it has already been compiled.

■ Another issue continues to divide the parties in this case. When it remanded this case to Commerce, the court instructed Commerce to revise its constructed value ("CV") calculation so that adjustments for circumstances of sale would not reduce the general expenses components of CV below the statutory minimum amount of 10% of the cost of materials and fabrication. The court held that "adjustments based on sales expenses from transactions which were insufficient to establish a foreign market value may not reduce the statutory minimal component of general expenses." *Zenith Electronic Corp. v. United States,* 770 F.Supp. at 657.

There continues to be a dispute about how Commerce made adjustments to constructed value for differences in circumstances of sale under the authority granted in 19 U.S.C. § 1677b(a)(4). In its original determination, Commerce made adjustments for circumstances of sale in the home market which lowered the general expenses below the statutory minimum of 10% set out in 19 U.S.C. § 1677b(e)(1)(B)(i).

In its earlier opinion in this case, the court disapproved the adjustments which lowered the general expenses below the 10% statutory amount and reasoned as follows:

Logical consistency should dictate that if sales in the home market are so insignificant that they lead Commerce to reject them as a source of foreign market value and choose constructed value instead the actual selling expenses associated with those insignificant home market sales should also not be relied upon for any related purpose. Given the authority to adjust constructed value for circumstances of sale, the court sees only one way to reconcile it with a statutory minimum for general expenses and a statutory bar on the use of insignificant sales as a source of foreign market value. (19 U.S.C. § 1677b(a)(1)(B)). That way is to maintain the 10% as an amount which cannot be lowered by adjustments derived from sales which are too insignificant to support a foreign market value.

*Zenith Electronics Corp. v. United States,* 770 F.Supp., at 657.

The court instructed Commerce to make the appropriate changes to the constructed value calculations on remand. Now the parties disagree on whether Commerce fully implemented the ruling of the court. On the one hand, Commerce and the Taiwan interests argue that Commerce satisfied the terms of the remand because, when all was said and done, the adjustment to foreign market value for differences in circumstances of sale left the general expense component of constructed value *above* the statutory minimum of 10% of cost of manufacture. Zenith, however, points out that Commerce reached its final figure after first allowing the selling expenses from the insignificant home market sales to reduce the general expenses *below* the statutory minimum and it was only the upward adjustments needed to account for expenses from *US sales* which brought general expenses back to at least its statutory minimum.

In the opinion of the court, the procedure used by Commerce in the remand has the same legal defects as the direct use of

home market selling expenses to reduce constructed value general expenses to a final amount less than the statutory minimum. This is clearly illustrated in an example used by Zenith which can be stated as follows: For purposes of this example, we will assume that constructed value general expenses are $12 and that the statutory minimum amount for general expenses is $10, being 10% of a cost of manufacture of $100. If, in that hypothetical case, the selling expenses from disregarded home market sales were $4, Commerce would not be allowed to subtract the full $4 of home market selling expenses from the actual general expense figure of $12 so as to bring the general expense figure to $8, a sum which is below the statutory minimal amount of $10. Now we add an additional fact into the hypothetical, the existence of $2 of selling expenses from the comparison US sale, an amount which must be *added* to constructed value as an upward adjustment for circumstances of sale. If the court approved the procedure used by Commerce in this remand, then in this hypothetical example, the $4 of home market expenses could first be fully used to lower the $12 of actual general expenses down to $8; that $8 figure could be raised by the $2 of US expenses back to $10, and we could say that we had a figure of $10 for general expenses—an amount equal to the statutory minimum. However, this example should make it apparent that the final figure was arrived at only by using a step in which home market selling expenses had reduced the general expenses to less than the statutory minimum. The important statutory considerations which the court analyzed in its prior opinion are not avoided just because adjustments from selling expenses in the US ultimately raise the figure for general expenses. The crux of the matter is that the sales which must be disregarded for the purpose of determining foreign market value under 19 U.S.C. 1677b(a)(1)(B) should not undermine the specific statutory provision designed as a replacement for those disregarded sales.

It is of no legal importance that the manner in which the final circumstances of sale adjustment is made is by means of a single mathematical adjustment. This does not give Commerce the authority to accomplish a forbidden result by earlier additions or subtractions. Accordingly, Commerce will now be required to insure that constructed value general expenses are not reduced to less than the statutory minimal amount by home market selling expenses *before* US selling expenses are added back. In terms of the example earlier given, this would mean that the $4 of expenses from home market sales could reduce general expenses only to the statutory minimum of $10, after which the $2 of US expenses would require a circumstance of sale adjustment raising the amount to $12.

There are four matters on which the government agrees that Commerce erred. Stated briefly, these were (1) the failure to cap the amount of forgiven tax which may be added to United States price; (2) a miscalculation of the so-called "second-level" adjustment for the tax consequences of differences in circumstances of sale; (3) the deduction of AOC's home market advertising expenses from foreign market value twice in making exporters sales price comparisons and; (4) leaving AOC's labor expense as zero for the constructed value calculation in exporters sales price comparison.

■ As to the first matter, this court has repeatedly held that the adjustment for taxes required by 19 U.S.C. § 1677a(d)(1)(C) requires Commerce to calculate the adjustment for forgiven taxes as an addition to USP and to do so in a way which "caps" the amount at the lesser of the amount of tax actually passed through to the consumer in the home market, or the amount which would have been assessed on the exported merchandise.

This court has consistently held that in calculating the adjustment for forgiven taxes (which must be made by means of an addition to United States price) that addition must be capped so that it is not greater than the amount of tax that was actually passed through to home market purchasers. Commerce concedes that it did not "cap" the amount of forgiven tax added to USP and agrees that a remand is appropri-

ate in the present case in order to impose such a "cap."

■ On the second matter, Commerce agrees that it erred in making circumstances of sales adjustments which had been limited by the court to "those circumstances of sale which do not flow from the originally determined dumping price...." *Zenith Electronics Corp. v. U.S.*, 770 F.Supp. at 651. In the course of making these adjustments, Commerce apparently did not account for the tax consequences of duties in export value but only accounted for them in home market taxable value. This led to an understatement of fair market value and consequent understatement of the dumping margins. Stated differently, this means that Commerce removed the tax consequences of import duty from foreign market value but left the tax consequences of import duty in USP. To correct this error, Commerce must include the import duty which is in the export tax basis as part of the differences in circumstances of sale against which the tax rate is applied when quantifying the total effect of differences in circumstances of sale on the calculation of the amount of tax to be added to USP.

The final two matters are two clerical errors which require correction. AOC's home market advertising expenses were deducted from foreign market value twice in the course of making comparisons with exporters' sale price. In addition, AOC's labor expenses, which were set at zero in preparation for redefining their value, were left at zero for the constructed value labor expense. These were plainly inadvertent clerical errors and fairness dictates that they should be corrected on remand.

For the reasons given above, the motion for final judgment is Denied and it is hereby ORDERED that the case is remanded to Commerce and Commerce is given 90 days for the following purposes:

1. To determine home market tax pass-through in a manner consistent with the constant costs and imperfect competition characteristic of the Taiwanese color television market and on the basis of the existing record.

2. To cap the upward adjustment to USP for forgiven tax at the amount of tax found to be passed through to home market purchasers.

3. To make the second level adjustment for the difference in circumstances of sale adjustments included in the export and home market taxable values.

4. To insure that the general expenses component of constructed value is not reduced at any time to less than the statutory minimum amount by reason of adjustments for selling expenses associated with the disregarded home market sales.

5. To correct the double deduction of AOC's home market advertising expenses.

6. To correct the specification of constructed value labor expenses as having a value of zero.