6 F.3d 1511
 DAEWOO ELECTRONICS CO., LTD. and Daewoo Electronics Corp. of
America, Inc., and Samsung Electronics Co., Ltd. and Samsung
Electronics America, Inc., and Goldstar Co., Ltd. and
Goldstar Electronics International, Inc., Plaintiffs-Appellants,
v.
INTERNATIONAL UNION OF ELECTRONIC, ELECTRICAL, TECHNICAL,
SALARIED AND MACHINE WORKERS, AFL-CIO, International
Brotherhood of Electrical Workers of America, Independent
Radionic Workers of America and Industrial Union Department,
AFL-CIO, Plaintiffs-Appellants,
v.
ZENITH ELECTRONICS CORP., Plaintiff-Appellee,
v.
The UNITED STATES, Defendant-Appellant.
 Nos. 92-1558 to 92-1562.
 United States Court of Appeals,
Federal Circuit.
 Sept. 30, 1993.
Rehearing and Suggestion for Rehearing
In Banc Denied Nov. 18, 1993.
 
 David A. Gantz, Reid & Priest, Washington, DC, argued, for plaintiffs-appellants, Daewoo Electronics Co., Ltd. and Daewoo Electronics Corp. of America, Inc. With him on the brief, were Elizabeth H. Lefebvre and Jennifer Karas.
 Warren E. Connelly, Akin, Gump, Hauer & Feld, L.L.P., Washington, DC, argued, for plaintiffs-appellants, Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc. With him on the brief, was P. Bryan Christy, III.
 Michael P. House, Donovan, Leisure, Rogovin & Schiller, Washington, DC, argued, for plaintiffs-appellants, Goldstar Co., Ltd. and Goldstar Electronics International, Inc. With him on the brief, were R. Will Planert and John R. Brautigam.
 Paul D. Cullen, Collier, Shannon, Rill & Scott, Washington, DC, argued, for plaintiffs-appellants, International Union of Electronic, Elec., Technical, Salaried and Machine Workers, AFL-CIO, Intern. Brotherhood of Elec. Workers of America, Independent Radionic Workers of America and Indus. Union Dept., AFL-CIO. With him on the brief, were Jeffrey S. Beckington, David C. Smith, Jr. and Stephen A. Jones.
 John D. McInerney, Deputy Chief Counsel for Import Admin., argued, for defendant-appellant, the U.S. With him on the brief, was Robert E. Nielsen, Sr. Atty., Office of the Chief Counsel for Import Admin. Also on the brief, were Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director and Velta A. Melnbrencis, Asst. Director, Commercial Litigation Branch, Dept. of Justice, Washington, DC.
 Frederick L. Ikenson, Frederick L. Ikenson, P.C., Washington, DC, argued, for plaintiff-appellee, Zenith Electronics Corp. With him on the brief, was J. Erick Nissley.
 Noel Hemmendinger and William J. Clinton, Wilkie Farr & Gallagher, Washington, DC, were on the brief, for Amicus Curiae, American Ass'n of Exporters and Importers.
 Bruce Mark Mitchell and David L. Simon, Grunfeld, Desiderio, Lebowitz & Silverman, Washington, DC, were on the brief, for amicus curiae, Emerson Radio Corp.
 Before NIES, Chief Judge, RICH, Circuit Judge, and SKELTON, Senior Circuit Judge.
 NIES, Chief Judge.
 
 
 1
 These appeals challenge the antidumping duties imposed on color television receivers from Korea imported between October 19, 1983 and April 30, 1984. The decisions from the Court of International Trade to be reviewed are Daewoo Electronics Co. v. United States, 712 F.Supp. 931 (Ct. Int'l Trade 1989) ("Daewoo I "); Daewoo Electronics Co. v. United States, 760 F.Supp. 200 (Ct. Int'l Trade 1991) ("Daewoo II "); and Daewoo Electronics Co. v. United States, 794 F.Supp. 389 (Ct. Int'l Trade 1992) ("Daewoo III "). We affirm in part, reverse in part, vacate the judgment and remand for entry of a judgment in accordance with this decision.I.
 
 Background
 
 2
 Appellants Daewoo Electronics Co. Ltd., Samsung Electronics Co., Ltd., and Goldstar Co., Ltd. (collectively "the Korean companies"), are leading importers of color television receivers into the United States from Korea. Petitions by the International Union of Electronic, Electrical, Technical, Salaried, and Machine Workers, AFL-CIO, the International Brotherhood of Electrical Workers of America, and the Independent Radionic Workers of America and Industrial Union Department, AFL-CIO (collectively "the Unions") and by Zenith Electronics Corp., resulted in an antidumping investigation into the Korean television receivers imported between October 19, 1983 and April 30, 1984. On December 28, 1984, the International Trade Administration of the Department of Commerce ("ITA") published the final determinations of its first administrative review, concluding that dumping margins of 14.88 percent, 12.23 percent and 7.47 percent existed on U.S. sales of Daewoo, Samsung, and Goldstar products respectively.[1] Color Television Receivers from Korea; Final Results of Administrative Review of Antidumping Duty Order, 49 Fed.Reg. 50420, 50431 (1984). As a result of rulings of the Court of International Trade in the successive appeals and remands, the dumping duties were revised upward to 48.18 percent, 30.36 percent, and 33.95 percent for Daewoo, Samsung, and Goldstar, respectively which the trial court approved.
 
 
 3
 The Korean companies, the Unions, and the United States have each appealed from the judgment of the Court of International Trade raising numerous issues. We address the propriety of the following holdings in the Daewoo opinions: that 19 U.S.C. Sec. 1677a(d)(1)(C) of the antidumping law requires that ITA make an econometric analysis of tax incidence in foreign markets (Daewoo I ); that the ex factory price must be used for tax adjustments of the U.S. price (Daewoo II ); and that under 19 U.S.C. Sec. 1673f(a) a bond deposit may not cap the amount of liability for antidumping duties (Daewoo III ). The identical issue of the multiplier effect of 19 U.S.C. Sec. 1677a(d)(1)(C) raised in the Korean companies' appeal was rejected in the recently decided appeal, Zenith Electronics Corp. v. United States, 988 F.2d 1573, 1581 (Fed.Cir.1993), which is controlling here. In addition, our disposition of the tax incidence issue moots two other issues: first, the Korean Companies' appeal from the holding of Daewoo II, 760 F.Supp. at 204-07, rejecting the ITA's finding of full tax pass-through in the Korean receiver market; and second, the Unions' challenge of the ITA's use of best information available pursuant to 19 U.S.C. Sec. 1677e(c) to adjust the USP. Daewoo III, 794 F.Supp. at 391-92.
 
 II.
 
 4
 Adjustment for Taxes Levied On Home Country Sales Only
 
 
 5
 The antidumping statute, 19 U.S.C. Sec. 1677a(d)(1)(C) (1988), recognizes that many countries assess excise or commodity taxes upon goods sold for domestic consumption, but forgive such taxes on export sales. To prevent the creation of dumping margins merely because the country of exportation taxes home market sales but not exports,[2] the antidumping law provides an offsetting adjustment to the sales price of the goods in the United States (the "U.S. price" or "USP"). Section 1677a(d)(1)(C) mandates that:
 
 
 6
 The purchase price and the exporter's sales price shall be adjusted by being ... increased by ... the amount of the taxes imposed in the country of exportation directly upon the exported merchandise or components thereof, which have been rebated, or which have not been collected, by reason of the exportation of the merchandise to the United States, but only to the extent that such taxes are added to or included in the price of such or similar merchandise when sold in the country of exportation.
 
 
 7
 In its original determination, the ITA interpreted section 1677a(d)(1)(C) as allowing the addition to the U.S. price of the full amount of the Korean taxes on television sets forgiven upon export. In this case the Korean taxing authority imposed a special excise tax, a defense tax and a value added tax that resulted in an aggregate commodity tax of 50.04 percent of the price of the television receivers. None of these taxes were assessed against the receivers exported to the United States. It is undisputed that the taxes had been added to Korean home market prices and had actually been paid by the Korean companies. The ITA concluded that these facts met the requirements of section 1677a(d)(1)(C) for adding the full amount of the forgiven commodity taxes to the USP. In ITA's view, the statute permits what it terms an "accounting" method of determining that taxes were added to or included in the price of merchandise sold in the home country.
 
 
 8
 In the first appeal of this determination, Daewoo I, 712 F.Supp. at 931, the trial court rejected the ITA's allowance of the full amount of these Korean taxes.[3] The trial court held that the final clause of section 1677a(d)(1)(C), allowing augmentation of USP "only to the extent that such taxes are added to or included in the price of such or similar merchandise when sold in the country of exportation," compelled the ITA to analyze the consumer tax incidence of the commodity taxes. Thus, instead of employing an accounting approach that allows USP to be increased by the full amount of a tax levied and paid on home market sales, the court reasoned that the ITA must undertake an econometric study of the Korean market to determine the tax incidence, or "pass through," of the commodity taxes upon consumers.[4] According to the court, only that amount of the commodity tax that consumers actually bore in an economic sense should be added to USP. In so doing, the court relied on its earlier decision in Zenith Electronics Corp. v. United States, 633 F.Supp. 1382 (Ct. Int'l Trade 1986), appeal dismissed as moot, 875 F.2d 291 (Fed.Cir.1989). Unimpressed by the ITA's reasoning that its accounting methodology was a long-standing agency practice, that an econometric analysis would place an impractical and extremely onerous burden on the agency and importers in almost every investigation, and that such an approach is imprecise and would artificially inflate dumping margins,[5] the court remanded to the ITA holding that its methodology was not in accordance with the law.
 
 
 9
 On remand, the ITA commissioned Dr. Paul Wachtel, an economist affiliated with New York University, to undertake the mandated tax incidence analysis. Wachtel developed a complex oligopolistic[6] model of the Korean receiver market based upon the behavior of a single, representative firm. Although this approach did not distinguish individual firm traits, Wachtel determined that such a model would not suffer losses in accuracy due to certain characteristics of the Korean receiver market. Based upon his analysis, Wachtel concluded that tax incidence in the Korean receiver market was 100 percent; i.e., that the consumer bore the entire amount of the Korean excise, defense and value-added taxes.
 
 
 10
 In a second appeal, Daewoo II, 760 F.Supp. at 200, the trial court rejected Dr. Wachtel's analysis, finding that the study did not adequately analyze Korean market data and that the aggregate approach did not reflect the reality of the marketplace. The court again remanded the case to the ITA. In this second remand, the ITA considered company-specific tax incidence measurements completed by Dr. Robert E. Litan of the Brookings Institute for the Korean companies and Dr. Michael D. Bradley of the George Washington University for Zenith. After rejecting the Litan study, the ITA adjusted USP based upon the Bradley study, which it characterized as the "best information available" pursuant to 19 U.S.C. Sec. 1677e(c) (1988).[7] The agency ultimately found tax incidence varying from 33-63 percent, leading to dumping margins of 30.36 percent for Samsung, 33.95 percent for Goldstar, and 48.18 percent for Daewoo. The trial court approved the ITA's analysis in Daewoo III, 794 F.Supp. at 389.
 
 
 11
 In this appeal, the United States and the Korean companies ask us to reverse the holding in Daewoo I and, in effect, the prior decision of the Court of International Trade in Zenith Electronics. They contend that the trial court erred in interpreting the statute to require the ITA to undertake an econometric measurement of tax incidence on home market consumers when adjusting USP to offset the forgiveness of consumption taxes upon exported merchandise.[8] In Zenith Electronics, 633 F.Supp. at 1398, the Court of International Trade had reached the "inescapable conclusion ... that Congress intended the administering agency to perform tax absorption measurements for application in individual cases." While the ITA ultimately appealed the ruling, this court dismissed the appeal in Zenith because of the absence of a case or controversy. 875 F.2d at 293. The instant case now requires resolution of the issue of whether section 1677a(d)(1)(C) compels the ITA to undertake a tax incidence analysis.
 
 
 12
 This question is one of statutory interpretation, which we must resolve with deference to the agency's interpretation rather than to the court's. Suramerica de Aleaciones Laminadas, C.A. v. United States, 966 F.2d 660, 663 (Fed.Cir.1992). When considering the agency's construction of 19 U.S.C. Sec. 1677a(d)(1)(C), we decide only whether "[the ITA's] interpretation of its statutory power falls within the range of permissible construction." Id. at 667. The Supreme Court has instructed that
 
 
 13
 a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.
 
 
 14
 We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations has been consistently followed by this Court whenever decision as to the meaning or reach of a statute has involved reconciling conflicting policies, and a full understanding of the force of the statutory policy in the given situation has depended upon more than ordinary knowledge respecting the matters subjected to agency regulation.
 
 
 15
 Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). The Court has further indicated that
 
 
 16
 [w]hen faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration. To sustain [an agency's] application of [a] statutory term, we need not find that its construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings.
 
 
 17
 Zenith Radio Corp. v. United States, 437 U.S. 443, 450, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337 (1978) (citations omitted).
 
 
 18
 These tenets extend to their limits when the ITA interprets the antidumping laws. As noted in Smith-Corona Group, Consumer Products Div., SCM Corp. v. United States, 713 F.2d 1568, 1571 (Fed.Cir.1983), cert. denied, 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984) (citations omitted):
 
 
 19
 The Tariff Act of 1930, as amended by the Trade Agreements Act of 1979, establishes an intricate framework for the imposition of antidumping duties in appropriate circumstances. The number of factors involved, complicated by the difficulty in quantification of those factors and the foreign policy repercussions of a dumping determination, makes the enforcement of the antidumping law a difficult and extremely delicate endeavor. [The ITA] has been entrusted with responsibility for implementing the antidumping law. [The ITA] has broad discretion in executing the law.
 
 
 20
 This court has recognized the ITA as the "master" of antidumping law, Consumer Prods. Div., SCM Corp. v. Silver Reed Am., Inc., 753 F.2d 1033, 1039 (Fed.Cir.1985), worthy of considerable deference. See alsoSuramerica, 966 F.2d at 667.
 
 
 21
 The statutory language of 19 U.S.C. Sec. 1677a(d)(1)(C) allows tax adjustment of USP "only to the extent that such taxes are added to or included in the price of such or similar merchandise when sold in the country of exportation." The ITA and its predecessor have consistently interpreted this language since its enactment in 1974 as a requirement to examine customary business records of exporters. If an exporter's records show that a tax was either a separate "add on" to the domestic price or, although not separately stated, was, in fact, included in the price and that the taxes were paid to the government, that satisfies the tax inquiry required by the statute for an adjustment of the USP. We conclude that this interpretation of the statute is reasonable. The statute does not speak to tax incidence, shifting burdens, or pass-through, nor does it contain any hint that an econometric analysis must be performed. The statutory language does not mandate that ITA look at the effect of the tax on consumers rather than on the Korean company. The reality is that, as an unavoidable incident of any sale by the company, these taxes can only be recouped in their entirety from purchasers.
 
 
 22
 Both Zenith and the Unions argue that such a reading of 19 U.S.C. Sec. 1677a(d)(1)(C) renders its final phrase superfluous, but we disagree. As indicated, the language specifies adjustment whether or not the tax is separately stated in the home market price. Further, taxes of the type forgiven upon export may not actually be charged upon all home market sales. Exemption may be allowed under various taxation regimes. For example, the statutes describing the Korean defense tax, special excise tax, and value-added tax each include exemption provisions for certain transactions, such as international navigation services or sales to the military. Defense Tax Act, No. 2768, art. 3 (1975); Special Excise Tax Act, No. 2935, art. 2 (1976); Value-Added Tax Act, No. 2934, art. 11 (1976). See also, e.g., Final Results of Antidumping Duty Administrative Review, Oil Country Tubular Goods from Canada, 56 Fed.Reg. 38408, 38414 (1991) (noting that only certain home market sales incur "provincial tax"). The phrase is not rendered superfluous by ITA's interpretation.
 
 
 23
 In Zenith Electronics, the Court of International Trade found support for econometric studies in the history of the Trade Act of 1974, Pub.L. No. 93-618, 88 Stat.1978, 2045, the legislation that added the disputed language of section 1677a(d)(1)(C) to the statute.[9] The court quoted the following passage from H.R.Rep. No. 571, 93d Cong., 1st Sess. 69 (1973) (emphasis added):
 
 
 24
 With the amendment, no adjustment to the advantage of the foreign exporter would be permitted for indirect tax rebates unless the direct relationship of the tax to the product being exported, or components thereof, could be demonstrated. Further, an adjustment for such tax rebates would be permitted only to the extent that such taxes are added to or included in the price of such or similar merchandise when sold in the country of exportation. This is to insure that the rebate of such taxes confers no special benefit upon the exporter of the merchandise that he does not enjoy in sales in his home market. To the extent that the exporter absorbs indirect taxes in his home market sales, no adjustments to purchase price will be made and the likelihood or size of dumping margins will be increased.
 
 
 25
 633 F.Supp. at 1396. The court also set forth a portion of Ambassador William D. Eberle's statement to the Senate Finance Committee, Hearings Before the Senate Committee on Finance on H.R. 10710, 93d Cong., 2d Sess. 310 (1974):
 
 
 26
 The definition of both "purchase price" and "exporter's purchase price" are amended to harmonize the treatment of foreign tax rebates under the Antidumping Act with the standard of their treatment under the countervailing duty law. No adjustment for tax rebates to the advantage of the foreign exporter will be permitted unless the direct relationship between the tax and the exported product or its components can be demonstrated. For example, if the exported product benefited from a tax rebate on the mortgage on the plant that produced it, the rebate could not be used in the computations to reduce the dumping margin. Moreover, an adjustment for a tax rebate will be permitted only to the extent such taxes are added to or included in the price of the merchandise when sold in the home market. To the extent the exporter absorbs indirect taxes in sales in the home market, no adjustment will be made to purchase price. The effect will be to increase the size of dumping margins under such circumstances.
 
 
 27
 633 F.Supp. at 1396-97. In the view of the trial court, these references constituted a "straight-forward explanation of the operation and purpose of the [disputed] clause" by Congress.[10] Id. at 1395.
 
 
 28
 We initially note that the thrust of these remarks expresses concern over identification of a particular tax with the specific product. Congress wished to limit any tax rebate to taxes with a direct relationship to the exported product. It is not at all clear what is meant by the later reference to "absorbs indirect taxes." But even if both of the quoted passages were intended to refer to tax incidence of directly related taxes, we cannot accept that these two passing references alone are sufficient to effect a revolutionary alteration of the ITA's and its predecessors' consistent use of an accounting approach. As the Supreme Court noted in Allen v. State Bd. of Elections, 393 U.S. 544, 568-69, 89 S.Ct. 817, 833, 22 L.Ed.2d 1 (1969), "in any case where the legislative hearings and debate are so voluminous, no single statement or excerpt of testimony can be conclusive." On this meager legislative history and with no real debate on what would have been a dramatic change in law, we cannot say that the ITA's interpretation of the statute contravenes the statute.
 
 
 29
 A consideration of subsequent legislative activity confirms this analysis. In Chaparral Steel Co. v. United States, 901 F.2d 1097, 1106 (Fed.Cir.1990), we stated that "additional deference may be given to an agency interpretation when a statutory provision remains unchanged after Congress has considered an amendment, particularly one that plainly would have reversed established agency practice on this issue." Although Congress both knew of the ITA's interpretation of the statute[11] and revisited the antidumping statute both in 1984 and 1988,[12] it took no action to modify the practice of the ITA.
 
 
 30
 In reaching this result, we are also cognizant of the onerous burden entailed by the Court of International Trade's mandate. In contrast to the commercial facts available in sales receipts, tax returns and other accounting records, an econometric analysis of tax pass-through requires numerous subsidiary market inquiries, entails a high degree of speculation based on one economic theory rather than another, and produces results of dubious soundness. As the Supreme Court noted in Zenith Radio, 437 U.S. at 458-59, 98 S.Ct. at 2449 (citation omitted), a countervailing duty case:
 
 
 31
 Even "modern" economists do not agree on the ultimate economic effect of remitting indirect taxes, and--given the present state of economic knowledge--it may be difficult, if not impossible, to measure the precise effect in any particular case.... In this situation, it is not the task of the judiciary to substitute its views as to fairness and economic effect for those of [the ITA].
 
 
 32
 Similarly, when this court considered the ITA regulations that modified foreign market value based upon cost differences in circumstances of sales, rather than on "value", we recognized that "[t]he ready availability of cost data that can be employed without extensive complex econometric analysis supports the reasonableness of [the ITA's] decision to rely on cost. Cost may be the only practical way to administer the statute." Smith-Corona, 713 F.2d at 1577 n. 27. An economic analysis of tax incidence may reasonably be rejected for the same reason. The delay and expense in making such an analysis in virtually every investigation would restrict the number of investigations which could be handled and interfere with ITA's statutorily mandated duty to "complete the [antidumping] determination within rigid time limits." Id. at 1577. Nor would this approach enable exporters to the United States to operate within the confines of the antidumping laws; antidumping duty assessments could issue based upon econometric measurements the exporter could not possibly predict. Further, we cannot conclude that the burden is worth undertaking because of more soundly based results. The results of econometric analysis of tax pass-through in this case resulted in three widely disparate opinions.
 
 
 33
 We thus cannot agree with the trial court that the ITA's interpretation of section 1677a(d)(1)(C) was contrary to the statute. We reverse this holding of Daewoo I, 712 F.Supp. at 954-56.
 
 III.
 Tax Basis
 
 34
 The Korean companies additionally allege error by the Court of International Trade in reversing the ITA's use of the net delivered selling price to the first unrelated customer as the imputed commodity tax base under 19 U.S.C. Sec. 1677a(d)(1)(C) for calculating the amount of tax adjustment. That provision mandates a calculation of imputed tax amounts to be added to the USP, but does not specify to which USP the Korean taxes are to be applied as the product moves to the consumer. This determination is important because the Korean taxes are not a specific amount, but instead ad valorem in nature; and it is difficult because the question is a hypothetical. The Korean taxes must be applied to sales of goods at some discrete moment in the stream of commerce with or in the United States, a different market from that in which the taxes should be levied, but are not, because of exportation.[13]
 
 
 35
 By analyzing Korean tax law and practice, the ITA sought to make an informed judgment on how the Korean authorities would theoretically tax the exported television receivers so as to select the most comparable price in the U.S. market. Upon the first remand, the ITA determined that in Korea, the taxes were assessed against the net price of the delivered television receivers to unrelated dealers. The Korean price paid by the dealer included post-factory costs, such as delivery and warehousing and the tax was assessed on the price including these post-factory costs. The ITA reasoned that the Korean dealers had the distinguishing trait of being the first parties in the Korean stream of commerce unrelated to the manufacturer. Accordingly, in selecting the U.S. prices, the ITA passed over the intracompany transfer price to affiliates of the Korean manufacturer which brought the receivers to the U.S., i.e., an ex factory price. Instead the ITA selected as most comparable the sales price to customers who were the first unrelated purchasers in the chain. The USP from the importer to U.S. dealers thus also included transportation, storage and selling expenses.
 
 
 36
 On appeal, Daewoo II, 760 F.Supp. at 202-04, the Court of International Trade rejected the ITA's selected tax base. According to the court, the "plain mandate of Korean law" indicated "that the tax base in the home market is the price at which the goods are carried out of the place of manufacture." Id. at 203. The court considered the statutory language to compel use of an ex factory price, which does not include any post-factory expenses, as the tax base. In the view of the trial court, the ITA acted without the support of substantial evidence in the record that the sales price to the first unrelated purchaser in the United States would likely be the tax base chosen by Korean authorities. The court did note, however, that "in the Korean market the taxable events were sales to unrelated dealers, but that just happened to be the type of price at which the ex factory transaction occurred." Id. at 204.
 
 
 37
 On review of this issue, like the trial court, we look to see whether substantial evidence supports the decision of the ITA on this issue. Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Matsushita, 750 F.2d at 932 (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)). The specific determination we make is "whether the evidence and reasonable inferences from the record support the [ITA] finding." Matsushita, 750 F.2d at 933. The question is whether the record adequately supports the decision of the ITA, not whether some other inference could reasonably have been drawn. As frequently stated, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Id. (quoting Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 619-20, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966)).
 
 
 38
 It cannot be determined from review of the three Korean tax statutes alone what would be the tax base in Korea. The legislation is broadly worded and does not specify whether, for instance, delivery and insurance costs are included. The Value-Added Tax Act, No. 2934, art. 6 (1976) provides only that a taxable transaction consists of "the delivery and/or transfer of goods." The "taxable basis" consists of monetary payments for those goods; although such items as damaged goods are excluded from the basis, the statute does not address delivery costs. Id. at art. 13.
 
 
 39
 The Special Excise Tax Act, the statute apparently relied upon by the Court of International Trade, seeDaewoo II, 760 F.Supp. at 203, is at first blush more helpful.[14] It provides that the appropriate tax base for manufacturers consists of "the price at which the goods are carried out from the factory." Special Excise Tax Act, No. 2935, art. 8 (1976). Although the translated statutory language suggests what we would call an ex factory price, i.e., without delivery and other post-factory charges, it could also be that the price contemplated by the statute includes an add-on for the "carrying out from the factory."
 
 
 40
 In reaching its conclusion on the USP, the ITA relied on actual Korean tax practice, not merely on the statutes. As part of the ITA investigation, the Korean companies submitted numerous accounting records providing information on receiver sales and taxation. These records spanned tens of thousands of sales over the period under review. It is uncontested that these records demonstrate that in each case, the tax base employed by the Korean authorities consisted of the full delivered sales price to dealers. The tax base actually employed by the Korean authorities therefore included delivery, warehousing and other post-factory costs. In addition, the Korean companies point to evidence demonstrating that, when the manufacturer sold receivers to its affiliate rather than directly to an unrelated dealer, Korean tax officials used the dealer price as the tax base and ignored the intra-company transfer price.
 
 
 41
 Given this evidence, we cannot agree with the trial court that the ITA erred in selecting the analogous point for the tax base in the United States. Substantial evidence supports the ITA's choice, and that is all the statute requires. The Court of International Trade's rejection of the USP selected by the ITA for lack of substantial evidence is reversed.
 
 IV.
 Cap on Duties
 
 42
 The Korean companies also appeal the Court of International Trade's holding in Daewoo III, 794 F.Supp. at 393, that no cap on assessment rates exists if estimated duties are deposited in the form of a bond.[15] This ruling concerns an ITA regulation, 19 C.F.R. Sec. 353.50, which specifically treated cash deposits and bond deposits the same for capping purposes.[16]
 
 
 43
 Under the antidumping laws, estimated duties may be assessed and must be paid or guaranteed before the amount is finally resolved. If a preliminary determination indicates that dumping has occurred, 19 U.S.C. Sec. 1673b(d) requires the ITA to "order the posting of a cash deposit, bond, or other security, as it deems appropriate, for each entry of the merchandise concerned equal to the estimated average amount by which the [FMV] exceeds the [USP]."
 
 
 44
 If a preliminary determination matures into a final affirmative determination of dumping and issuance of a dumping order which exceeds the cash or bond deposit, the ITA by regulation limited an importer's antidumping duty liability to the amount of the previously deposited, estimated duties whether the deposit was in the form of cash or bond. In issuing this regulation, the ITA relied on the statute respecting the cap although the statute does not specifically deal with capping by a bond deposit. The pertinent statute, 19 U.S.C. Sec. 1673f(a) (1988), provides:
 
 
 45
 If the amount of a cash deposit collected as security for an estimated antidumping duty ... is different ... from the antidumping order, ... then the difference shall be--
 
 
 46
 (1) disregarded, to the extent the cash deposit collected is lower than the duty under the order, or
 
 
 47
 (2) refunded, to the extent the cash deposit is higher than the duty under the order.
 
 
 48
 The Korean companies here covered their estimated duty obligations with bonds in accordance with the statute and regulations.
 
 
 49
 In determining that bond deposits did not suffice to cap antidumping duty liability, the Daewoo III court relied upon a ruling in Zenith Electronics v. United States, 770 F.Supp. 648 (Ct. Int'l Trade 1991) ("Zenith II "). There, the court rejected the ITA's interpretation that a bond deposit had the same effect as a cash deposit. The ITA had argued that section 1673f(a), in referring only to cash deposits, contrasted with other related sections which refer also to bonds and other forms of security, see 19 U.S.C. Secs. 1673b(d)(2), 1673d(c)(2)(B), 1673e(c)(1), and believed that the difference was an inadvertence which would have awkward results. However, the court disagreed, noting that section 1673f(a) appeared to single out cash deposits, and that a cap on assessment rates for deposits in the form of bonds or other security was contrary to the statute. Zenith II, 770 F.Supp. at 651-54. Applying this rule, the Daewoo III court held that the Korean companies were liable for the amount of the dumping margin determined in the final antidumping order--an amount significantly greater than the estimated duties for which they posted a bond. 794 F.Supp. at 393.[17]
 
 
 50
 In considering the issue, we continue to rely upon the case law previously cited in Part II of this opinion respecting deference to the ITA's interpretation. We have additionally examined the authority of Melamine Chemicals, Inc. v. United States, 732 F.2d 924 (Fed.Cir.1984), where this court also considered an antidumping regulation promulgated by the ITA. We there observed:
 
 
 51
 When the issue is the validity of a regulation issued under a statute that an agency is charged with administering, it is well established that the agency's construction is entitled to great weight. Similarly, agency regulations are to be sustained unless unreasonable and plainly inconsistent with the statute, and are to be held valid unless weighty reasons require otherwise.
 
 
 52
 Id. at 928 (citations omitted). We are also mindful of the ITA's past practice in this area. The Trade Agreements Act of 1979, Pub.L. No. 96-39, Sec. 107, 93 Stat. 144, 193, provided that its provisions, including 19 U.S.C. Sec. 1673f(a), would take effect on January 1, 1980. The ITA issued 19 C.F.R. Sec. 353.50 the next month, on February 6, 1980, interpreting the statute to allow the cap for bond and cash deposits. 45 Fed.Reg. 8182, 8204. In this regard, the Supreme Court has instructed that "an administrative practice has particular weight when it involves a contemporaneous construction of a statute by the [persons] charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new." Zenith Radio Corp. v. United States, 437 U.S. 443, 450, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337 (1978) (citations omitted). We further note that the ITA has consistently placed a ceiling upon antidumping duties irrespective of whether a bond or cash deposit is posted as security.
 
 
 53
 With these standards guiding us, we again must hold that the Court of International Trade erred by substituting its interpretation for that of the ITA. Section 1673f(a) does not prohibit the application of the cap to bonds. This provision simply does not speak to whether estimated duty bonds cap antidumping duties. Given this silence, as well as the statute's authorization to file bonds to cover estimated duties, we cannot say that the ITA's allowance of a duty ceiling for bonds is contrary to the statute. We also are unpersuaded of any other "weighty reasons" to hold that the ITA's longstanding practice rests on an unreasonable interpretation of the statute.[18]
 
 
 54
 An examination of the antidumping statute's legislative history buttresses our conclusion. The House Committee Report to the 1979 Trade Agreements Act includes the following passage:
 
 
 55
 [T]he Committee understands that it is the intent of the Authority to require cash deposits only in those cases where it believes that bonds or other forms of security will not adequately protect the revenue. Because injurious dumping has not been finally determined at this point in the investigation and a requirement of a cash deposit, if unnecessary, might represent a burden to the importer, the Committee has agreed with this practice.
 
 
 56
 H.R.Rep. No. 31, 96th Cong., 1st Sess. 62 (1979). Further, this court has recognized that "failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress." Chaparral Steel, 901 F.2d at 1106 (quoting NLRB v. Bell Aerospace Co., 416 U.S. 267, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974)). Although Congress has twice significantly amended the Act, it did not alter section 1673f(a) on either occasion.[19] Both of these actions evidence that the policy of the ITA comports with congressional intent.
 
 
 57
 In reaching its conclusion, the Court of International Trade relied principally on a "clear distinction [between treatment of cash and bonds] in the underlying international agreements" that the U.S. international trade laws were designed to implement. Zenith Electronics, 770 F.Supp. at 653. The court concluded that while the GATT Subsidies Code provided for a cap whether the security took the form of cash or bond, the GATT Antidumping Code distinguished a security from cash and only a cash deposit capped the duties. We do not find such differences between the GATT Antidumping and Subsidies Codes. The court quoted from a House of Representatives reprint of the GATT Antidumping Code[20] which stated that provisional measures "may take the form of a provisional duty or, preferably, a security--by deposit or bond--equal to the amount of the anti-dumping duty provisionally estimated." Id. (emphasis added). From this language, the court then reasoned, "[t]his establishes a distinction in the Antidumping Code between 'provisional duty,' which would be the equivalent of cash deposits under the law, and the posting of securities." Id.
 
 
 58
 Our examination of the GATT Antidumping Code reveals that the distinction drawn by the Court of International Trade was based on an incorrect print.[21] The correct version of the GATT Antidumping Code reads: "[p]rovisional measures may take the form of a provisional duty, or, preferably, a security--by cash deposit or bond--equal to the amount of the antidumping duty provisionally estimated."[22] The addition of the word "cash" negates the court's interpretation that a security could not be a cash deposit.
 
 
 59
 We conclude that the Court of International Trade erred in invalidating the ITA's regulation on the ground of conflict with section 1673f(a). The holding of Daewoo III, 794 F.Supp. at 393, that bond deposits do not cap antidumping duties is reversed.
 
 V.
 Conclusion
 
 60
 For the foregoing reasons, we affirm the decision of the Court of International Trade on the issue of multiplier effect of 19 U.S.C. Sec. 1677a(d)(1)(C), and reverse its rulings on the other issues addressed herein. The case is remanded for proceedings consistent with this opinion.
 
 VI.
 Costs
 
 61
 Each party shall bear its own costs.
 
 
 62
 AFFIRMED-IN-PART, REVERSED-IN-PART, AND REMANDED.
 
 
 
 [1]
 Where, as here, goods identical to the imported goods are sold in the home market of the exporting country, a margin of dumping is determined by comparing the foreign market value ("FMV") to the United States price ("USP"). The absolute dumping margin for a sale is the amount, if any, by which FMV exceeds USP
 Determinations of USP and FMV often entail involved calculations. USP is based upon the import's "purchase price," as defined by 19 U.S.C. Sec. 1677a(b), or if the first sale to an unrelated American purchaser occurred in the United States, upon the "exporter's sales price," as provided in 19 U.S.C. Sec. 1677a(c). FMV is based upon home market sales, third country sales, or constructed value. 19 U.S.C. Sec. 1677b. Once these base figures are determined, Commerce further modifies them to account for shipping costs, differences in commercial quantities sold, or other factors pursuant to statutory provisions and its own regulations. See, e.g., 19 U.S.C. Secs. 1677a(d), 1677b(a)(1)(A).
 
 
 [2]
 As an example, assume that goods are sold for $100 in both the home market and the United States. While a tax of $50 is imposed in the home market, none is levied in the United States. If tax is not accounted for, a comparison of USP and FMV produces a dumping margin of $50
 
 
 [3]
 The standard of review is set forth in 19 U.S.C. Sec. 1516a(b)(1)(B), which provides:
 The court shall hold unlawful any determination, finding, or conclusion found--
 (B) in an action brought under paragraph (2) of subsection (a) of this section, to be unsupported by substantial evidence on the record, or otherwise not in accordance with law.
 28 U.S.C. Sec. 2640(b) requires the Court of International Trade to apply this "substantial evidence" standard. SeeMatsushita Elec. Indus. Co. v. United States, 750 F.2d 927, 932 n. 10 (Fed.Cir.1984).
 
 
 [4]
 A leading introductory economics textbook describes a tax incidence analysis as asking the question:
 Who ultimately pays a particular tax? Does the burden stay on the person on whom it is first levied? One cannot assume that the people [a government] says a tax is levied on will end up paying that tax. They may be able to shift the tax: shift it "forward" on their customers by raising their price as much as the tax; or shift it "backward" on their suppliers (wage earners, rent and interest receivers) who end up being able to charge them less than they would have done had there been no tax.
 Economists therefore say: We must study the final incidence of the tax--the way its burden ultimately is borne, the totality of its effects on commodity prices, factor-prices, resource allocation, efforts, and composition of production and consumption. Tax incidence is no easy problem and requires all the advanced tools of economics to help toward its solution.
 Paul A. Samuelson, Economics 164-65 (11th ed. 1980).
 A simple example may illuminate this argument. Suppose a government imposes a sales tax of $50 upon previously untaxed merchandise sold for $100. Assuming away all other market intricacies, if the ultimate cost to the consumers becomes $150 following the tax, the tax incidence is 100%. The seller has passed through the entire amount of the tax to the purchaser.
 If, however, the price of the merchandise rises to only $125 after the tax is imposed, the tax incidence is 50%. Here, the seller has passed through half the tax to the consumer, either absorbing or shifting backward the remaining $25.
 
 
 [5]
 To the extent tax incidence is less than 100%, an economic or econometric analysis leads to a smaller upwards adjustment of USP than the accounting approach and therefore to greater dumping margins. To continue the previous example, suppose USP is $75. Further assume that a home market tax of $50, imposed on merchandise previously costing $100, resulted in a FMV of $125. If tax incidence is assumed to be 100%, USP is adjusted from $75 to $125, and no dumping margin exists. If tax incidence is instead considered to be 50%, then USP is adjusted upwards by only half the amount of the tax, from $75 to $100. Comparing a USP of $100 to a FMV of $125 results in a dumping margin of $25
 
 
 [6]
 An oligopoly is a "market condition in which sellers are so few that the actions of any one of them will materially affect price and hence have a measurable impact upon competitors." American Heritage Dictionary 866 (2d college ed. 1991). Here, the Korean receiver market was determined to be an oligopoly
 
 
 [7]
 Section 1677e(c) provides:
 Determinations to be made on best information available. In making their determinations under this title, the administering authority and the Commission shall, whenever a party or any other person refuses or is unable to produce information requested in a timely manner and in the form required, or otherwise significantly impedes an investigation, use the best information otherwise available.
 See generallyAtlantic Sugar, Ltd. v. United States, 744 F.2d 1556, 1559-62 (Fed.Cir.1984).
 
 
 [8]
 Amicus Curiae, American Association of Exporters and Importers, also submitted briefing on this issue, urging reversal of the Court of International Trade
 
 
 [9]
 No party argues that a mandate for tax incidence analyses comes from any other source
 
 
 [10]
 The court also cited other references that merely recited the words of the statute. See 633 F.Supp. at 1395-97
 
 
 [11]
 See Options to Improve the Trade Remedy Laws: Hearings Before the House Subcommittee on Trade, Committee on Ways and Means, 98th Cong., 1st Sess. 619, 624 (1983) (statement of Terence P. Stewart informing Congress that Commerce does not require proof of tax "pass through" when adjusting USP for domestic taxes)
 
 
 [12]
 Omnibus Trade and Competitiveness Act, Pub.L. No. 100-418, 102 Stat. 1107 (1988); Trade and Tariff Act of 1984, Pub.L. No. 98-573, 98 Stat. 2948
 
 
 [13]
 An example may demonstrate the significance of this determination. Assume that certain goods sell for $200 in both the United States and in the seller's home market, and that the foreign market tax rate is 50%. In the United States, the goods are sold from the factory to a related distributor for $100. The distributor then sells the goods to consumers for $200. In the foreign market, the goods are sold directly to consumers for $200, plus a tax of $100, for a total of $300
 If the tax base is considered to be the sales price to the first unrelated customer, then FMV, including taxes, equals $300. Commerce would also modify the base USP of $200 upwards by 50%, to equal $300. No dumping margin exists.
 If, however, the tax base is considered to be the factory sales price, Commerce would only modify a base USP of $100 to $150. As the FMV remains $300, a dumping margin of $150 results.
 
 
 [14]
 As the defense tax is a surtax on the special excise tax, it presents no relevant basis provisions and is unhelpful. See Defense Tax Act, No. 2768, art. 4, item 5 (1975)
 
 
 [15]
 Amici curiae Emerson Radio Corporation and the American Association of Exporters and Importers filed briefs on this issue
 
 
 [16]
 45 Fed.Reg. 8182, 8204 (1980) (codified at 19 C.F.R. Sec. 353.50) provided that:
 If the amount of the estimated antidumping duty deposited pursuant to the Preliminary Affirmative Determination is different from the ... Antidumping Duty Order, the difference ... shall be:
 (a) Disregarded, to the extent that the estimated duty is less than the duty determined to be assessable under the Order, or
 (b) Refunded, to the extent that estimated duties collected were more than the duty determined to be assessable under the Order.
 Commerce later clarified the provisional rate cap regulation:
 If the cash deposit or bond ... is different from the dumping margin ..., the Secretary will instruct the Customs Service to disregard the difference to the extent that the cash deposit or bond is less than the dumping margin....
 
 
 [54]
 Fed.Reg. 12742, 12779 (1989) (codified at 19 C.F.R. Sec. 353.23)
 
 
 [17]
 After the Court of International Trade issued its opinion in Zenith II, Commerce indicated that it would follow that holding, but prospectively only. 57 Fed.Reg. 45769 (1992). The court here rejected that limitation. In view of our resolution of this issue, the changed regulation may have prospective application only
 
 
 [18]
 Considered alone, the failure to specify bonds in Sec. 1673f(a) might indicate a deliberate decision by Congress against a cap based on a bond or security. Cf.Nissan Motor Corp. v. United States, 884 F.2d 1375, 1377 (Fed.Cir.1989) (reciting the familiar maxim that expressio unius est exclusio alterius, the expression of one thing is the exclusion of the alternative). However, such a conclusion is not the only possible inference here in view of the other factors discussed above
 
 
 [19]
 See supra note 12
 
 
 [20]
 Agreements Reached in the Tokyo Round of Multilateral Trade Negotiations, H.R.Doc. No. 153, 96th Cong., 1st Sess., pt. 1, at 312, 323 (1979)
 
 
 [21]
 The House Report cited by the court includes this language in its "Corrigendum" section, which instructs the reader to "[i]nsert 'cash' between 'by' and 'deposit' in the second line" of paragraph 2 of Article 10. H.R.Doc. No. 153, supra, at 333, 335
 
 
 [22]
 Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade, supra, Part I, art. 10, para. 2, 31 U.S.T. at 4933 (emphasis added)