295 F.3d 1263
 NTN BEARING CORPORATION OF AMERICA, NTN Corporation, American NTN Bearing Manufacturing Corporation, NTN Driveshaft, Inc., and NTN-Bower Corporation, Plaintiffs-Appellants, and
NSK Ltd. and NSK Corporation, Plaintiffs-Appellees, and
Koyo Seiko Co. Ltd. and Koyo Corporation of U.S.A., Plaintiffs-Appellees,
v.
UNITED STATES, Defendant-Cross Appellant, and
The Torrington Company, Defendant-Cross Appellant.
 No. 01-1328.
 No. 01-1333.
 No. 01-1342.
 United States Court of Appeals, Federal Circuit.
 DECIDED: June 28, 2002.
 
 COPYRIGHT MATERIAL OMITTED Kazumune V. Kano, Barnes, Richardson & Colburn, of Chicago, IL, argued for plaintiffs-appellants. With him on the brief was Donald J. Unger. Of counsel were Carolyn D. Amadon, and Shannon N. Rickard.
 Matthew P. Jaffe, Lipstein, Jaffe & Lawson, L.L.P., of Washington, DC, for plaintiffs-appellees, NSK LTD., et al. With him on the brief were Robert A. Lipstein, and Joseph A. Konizeski.
 Neil R. Ellis, Powell, Goldstein, Frazer & Murphy LLP, of Washington, DC, argued for plaintiffs-appellees, Koyo Seiko Co. Ltd, et al. With him on the brief was Elizabeth C. Hafner. Of counsel was Leigh Fraiser.
 Lucius B. Lau, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-cross appellant, United States. On the brief were Robert D. McCallum, Jr., Assistant Attorney General; David M. Cohen, Director; and Velta A. Melnbrencis, Assistant Director. Of counsel on the brief were John D. McInerney, Chief Counsel; Berniece A. Browne, Senior Counsel; Patrick V. Gallagher, Peter G. Kirchgraber, John F. Koeppen, and Arthur D. Sidney, Attorneys; Office of Chief Counsel for Import Administration, U.S. Department of Commerce, of Washington, DC. Of counsel were Stephen M. DeLuca, and David R. Mason, Attorneys.
 Wesley K. Caine, Stewart and Stewart, of Washington, DC, argued for defendant-cross appellant, The Torrington Company. On the brief were Terence P. Stewart, Geert De Prest, and Lane S. Hurewitz.
 Before MAYER, Chief Judge, LOURIE and SCHALL, Circuit Judges.
 MAYER, Chief Judge.
 
 
 1
 NTN Bearing Corporation of America, et al. appeal the judgment of the United States Court of International Trade affirming the Department of Commerce's Final Results of Redetermination Pursuant to Court Remand (Sept. 5, 2000), with respect to Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Romania, Singapore[,] Sweden and the United Kingdom; Amended Final Results of Antidumping Duty Administrative Reviews, 62 Fed.Reg. 61,963, 1997 WL 717528 (Nov. 20, 1997). NTN Bearing Corp. of Am. v. United States, 132 F.Supp.2d 1102 (Ct. Int'l Trade 2001). We affirm.
 
 
 Background
 
 
 2
 In May of 1989, the Department of Commerce ("Commerce") published antidumping duty orders on antifriction bearings ("AFBs") and parts thereof from several countries, including Japan. In June of 1996, Commerce initiated the seventh administrative review for AFBs from Japan for the period May 1995 to April 1996. See 19 U.S.C. § 1675(a)(1) (2000). The Japanese companies whose bearings and bearing parts were at issue are NTN Bearing Corporation of America, et al. ("NTN"), NSK Ltd. and NSK Corporation ("NSK"), and Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A. ("Koyo"). The Torrington Company ("Torrington") requested antidumping duty absorption inquiries for the Japanese companies in May and July of 1996, the results of which were considered in the review. See id. § 1675(a)(4). The final amended results of the review were published on November 20, 1997.
 
 
 3
 The parties appealed the final results of the administrative review to the Court of International Trade. NTN Bearing Corp. of Am. v. United States, 104 F.Supp.2d 110 (Ct. Int'l Trade 2000). The court (1) affirmed the use of NTN's sales at abnormally high profits in its normal value calculation; (2) affirmed adjustments to normal value using NTN's home market discounts and Koyo's post-sale price adjustments; (3) affirmed Commerce's calculation of constructed export price profit without regard to level of trade; (4) affirmed Commerce's denial of a downward adjustment to NTN's United States indirect selling expenses for interest incurred in financing cash deposits for antidumping duties; and (5) reiterated that Commerce is not statutorily authorized to conduct duty absorption inquiries for those antidumping orders in existence prior to the Uruguay Round Agreement Act. The court remanded to Commerce to annul all findings and conclusions made pursuant to the duty absorption inquiries. Id. at 157-58. The parties appealed the remand result to the Court of International Trade, which affirmed the annulment of the duty absorption inquiry results. 132 F.Supp.2d at 1106. NTN appeals, and the United States and Torrington cross-appeal. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).
 
 
 Discussion
 
 
 4
 We review the Court of International Trade's judgment, affirming or reversing the final results of an administrative review, de novo. Camargo Correa Metais, S.A. v. United States, 200 F.3d 771, 773 (Fed.Cir.1999). We apply anew the same standard used by the Court of International Trade, id., and will uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law," 19 U.S.C. § 1516a(b)(1)(B)(i) (2000). We review issues of statutory interpretation without deference. 200 F.3d at 773.
 
 
 5
 In an administrative review, Commerce recalculates the relevant variables to determine whether a foreign company is continuing the practice of dumping, i.e., selling its merchandise in the United States for less than a foreign like product in its home market. 19 U.S.C. § 1675(a)(2)(A) (2000). First, Commerce calculates the normal value, that price at which the good or a foreign like product is sold in the foreign home market in the ordinary course of trade. Id. § 1677b(a)(1)(B)(i). Normal value is subject to statutory adjustments; at issue here are those for circumstances of sales. Id. § 1677b(a)(6)(C)(iii). Second, Commerce calculates the export price, that price at which the good is sold to an unaffiliated purchaser in the U.S. market. Id. § 1677a(a). When an export price is unavailable or unreliable, Commerce constructs a model price to determine, as accurately as possible, the actual price of the good as sold in the U.S. market. Id. § 1677a(b). To generate the constructed export price, Commerce begins with a base price and then makes statutory adjustments. Id. § 1677a(c). The base price may be reduced, inter alia, by expenses incurred in selling the subject merchandise, id. § 1677a(d)(1), and any profit allocated to these expenses, id. § 1677a(d)(3). The normal value less the constructed export price yields the dumping margin. Additionally, Commerce may consider the results of antidumping duty absorption inquiries, if requested, in those reviews initiated two or four years after the publication of the order. Id. § 1675(a)(4). An administrative review may result in a changed antidumping duty payable under the order, id. § 1675(a)(1)(B), or the revocation, in whole or in part, of the duty order, id. § 1675(d)(1).
 
 I.
 
 6
 With respect to the calculation of normal value, NTN asserts that Commerce's inclusion of NTN's sales with abnormally high profits was not in accordance with law. Under 19 U.S.C. § 1677b(a)(1)(B)(i), normal value is the price at which the foreign like product is sold in the ordinary course of trade. Pursuant to 19 C.F.R. § 351.102(b), "[t]he Secretary may consider sales ... to be outside the ordinary course of trade ... based on an evaluation of all the circumstances particular to the sales in question, that such sales ... are extraordinary for the market in question. Examples ... are sales ... with abnormally high profits...." NTN argues that because the record demonstrates that some of its sales were made at abnormally high profits, the figures should be excluded automatically from the normal value calculation because the bearing market is a highly competitive market. We do not agree. This interpretation ignores the regulation's direction that exclusions be based upon a totality of the circumstances analysis. See CEMEX, S.A. v. United States, 133 F.3d 897, 900-01 (Fed.Cir.1998) (determining whether sales occurred in the ordinary course of trade by examining the surrounding circumstances of the sales at issue including sales to niche markets, percentages of sales with aberrant profits, shipping arrangements, and nature of sales). Commerce's requirement, therefore, that NTN provide evidence demonstrating that these profits were outside the ordinary course of trade was a reasonable exercise of its discretion. And in the absence of corroborating evidence, its refusal to exclude the figures from normal value was supported by substantial evidence.
 
 
 7
 Torrington argues that Commerce improperly allowed NTN's home market discounts and Koyo's home market post-sale price adjustments in the computation of normal value. To compute normal value under section 1677b(a)(6)(C)(iii), the home market price may be adjusted due to differences in the circumstances of sales. Torrington asserts that the price adjustments were calculated with, and likely included, sales not within the scope of the antidumping duty order. Torrington argues that Commerce's methodology violates our holding in SKF USA Inc. v. Ina Walzlager Schaeffler KG, 180 F.3d 1370 (Fed.Cir.1999), that price adjustments must be "calculated solely on the basis of merchandise within the scope of an antidumping duty order." Id. at 1377. In SKF USA, we upheld Commerce's refusal to accept SKF USA's billing adjustments because Commerce found that "SKF provided no means of identifying and segregating billing adjustments paid on non-scope merchandise," id. at 1375, and SKF failed to point to any evidence to show that the adjustments were limited to in-scope merchandise, id. at 1377. Substantial evidence supported the conclusion that "the claimed adjustments were not limited to merchandise within the scope of the antidumping order." Id. at 1372.
 
 
 8
 Here, however, because both NTN and Koyo presented methodologies to allocate in-scope and out-of-scope adjustments, which Commerce scrutinized and found to be acceptable, the more appropriate case to apply is Smith-Corona Group v. United States, 713 F.2d 1568 (Fed.Cir.1983). In Smith-Corona, we affirmed Commerce's acceptance of Brother's and Silver's post-sale price adjustments even though they were calculated with out-of-scope sales figures because proper apportionment reasonably correlated the adjustments to sales of in-scope merchandise. Id. at 1580. As in Smith-Corona, the price adjustment calculations here included sales of NTN's and Koyo's merchandise outside the scope of the order and they were properly excluded from the final adjustments. Thus, substantial evidence supports the court's finding that such inclusion did not unreasonably distort the final adjustments.
 
 
 9
 The court, moreover, properly upheld the adjustments in light of 19 U.S.C. § 1677m(e). Under section 1677m(e), information such as the adjustment calculations here, which is submitted by interested parties and does not meet all of Commerce's applicable requirements, shall be considered by Commerce if the information is timely, it can be verified, it is sufficiently complete to be reliable, the interested party acted to the best of its ability in supplying the data, and the information may be used without difficulties or distortions. Because Commerce was able to verify both Koyo's and NTN's data, determine whether adjustments were granted to in-scope and out-of-scope merchandise proportionately, and then calculate per-unit adjustments of in-scope sales, substantial evidence supports Commerce's decision to accept the price adjustments.
 
 II.
 
 10
 With respect to constructed export price ("CEP"), NTN makes two arguments. First, it asserts that Commerce's decision to determine CEP profit without regard to level of trade was not in accordance with law. Under 19 U.S.C. § 1677a(d)(3), CEP profit is computed, inter alia, based on "total expenses," defined in section 1677a(f)(2)(C), as those incurred with respect to the sales of the subject merchandise in the United States and the foreign like product in the exporting country. If this information is not available, then the total expenses incurred with respect to the "narrowest category of merchandise sold in the United States and the exporting country which includes the subject merchandise" is used. 19 U.S.C. § 1677a(f)(2)(C)(ii) (2000). The amount of profit, resulting from the "total expenses incurred in the United States" calculation, is deducted from the CEP. Id. § 1677a(d). NTN argues that the level of trade must be considered because the statute mandates that the "narrowest" category of merchandise be used. Commerce need not consider level of trade in its CEP profit calculation, however, because the most specific data set it must use under the statute is "category of merchandise," which means the class or kind of merchandise. We decline to read into the statute an additional requirement that Commerce consider the level of trade of the narrowest category of merchandise.
 
 
 11
 Second, NTN argues that Commerce's denial of a downward adjustment to NTN's United States indirect selling expenses for interest incurred in financing cash deposits for antidumping duties was not in accordance with law. Under 19 U.S.C. § 1677a(d)(1), reductions from constructed export price include: "(A) commissions for selling the subject merchandise in the United States; (B) expenses that result from, and bear a direct relationship to, the sale, such as credit expenses, guarantees and warranties; (C) any selling expenses that the seller pays on behalf of the purchaser; and (D) any selling expenses not deducted under subparagraph (A), (B), or (C)." The United States and Torrington argue that because the statute is nonspecific as to (D), Commerce's interpretation, that interest incurred in financing cash deposits for antidumping duties is an indirect selling expense, is reasonable and must be sustained. We agree.
 
 
 12
 NTN argues that Commerce should not consider such interest as an indirect selling expense because it has not done so in the past. Commerce, however, may alter its methodology if the change is supported by a reasonable basis, because a reasonable interpretation of the statute will be given deference. See Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Such deference extends to its limits when Commerce interprets the antidumping laws. Daewoo Elec. Co., Ltd. v. Int'l Union of Elec. Workers, 6 F.3d 1511, 1516 (Fed.Cir.1993). Here, Commerce adequately explained that interest expenses incurred in financing cash deposits are not an inevitable consequence of an antidumping duty order because companies may not need to borrow to finance the deposits. Thus, a company wishing to augment the CEP, and reduce its dumping margin, could adjust its accounting such that the cash duty deposits always incur interest expenses.
 
 III.
 
 13
 The United States and Torrington argue that the court erred in holding that Commerce is not statutorily authorized to conduct antidumping duty absorption inquiries for transition orders. The order at issue here is a transition order because it was published in 1989, before the January 1, 1995, effective date of the Uruguay Round Agreement Act. See Pub.L. No. 103-465, 108 Stat. 4809 (1994). FAG Italia S.p.A. v. United States, 291 F.3d 806 (Fed.Cir.2002), concluded that because 19 U.S.C. § 1675(a)(4), the subsection establishing absorption inquiries for antidumping duty orders, is silent with respect to Commerce's power to initiate duty absorption inquiries for transition orders, Commerce does not have the authority to conduct such inquiries. Therefore, we accept Commerce's annulment of the duty absorption inquiry results here, and their exclusion from this administrative review.
 
 
 Conclusion
 
 
 14
 Accordingly, the judgment of the United States Court of International Trade is affirmed.
 
 
 15
 AFFIRMED.